George W. JURGENS and Margaret M. Jurgens, Plaintiffs/Appellees,

v.

Timothy McKASY d/b/a Tonka Marketing and CBK, Ltd., Defendants–Appellants.

No. 89–1645, 90–1105.

United States Court of Appeals, Federal Circuit.

March 7, 1991.

Rehearing Denied April 5, 1991.

As Corrected April 5, 1991.

Suggestion for Rehearing In Banc Declined April 17, 1991.

Brian B. O'Neill, Faegre & Benson, Minneapolis, Minn., argued for plaintiffs/cross-appellants. With him on the brief were Alan M. Anderson and Felicia J. Boyd, Minneapolis, Minn.

Thomas Tinkham, Dorsey & Whitney, Minneapolis, Minn., argued for defendants-appellants. With him on the brief were Stuart R. Hemphill, Michael J. Wahoske and Richard C. Strasser, Minneapolis, Minn.

Before RICH, Circuit Judge, SMITH, Senior Circuit Judge, and PLAGER, Circuit Judge.

RICH, Circuit Judge.

These appeals are from a judgment of the United States District Court for the District of Minnesota in a jury case involving patent infringement and unfair competition. The judgment awarded increased damages and injunctive relief to plaintiffs George and Margaret Jurgens for defendants' patent infringement, unfair competition under Lanham Act § 43(a), and violation of the Minnesota Deceptive Trade Practices Act. We affirm the judgment in No. 90–1105, except to the extent it awarded increased Lanham Act damages. We dismiss appeal No. 89–1645 for lack of appellate jurisdiction.

## BACKGROUND

### A. The Parties and Technology

While driving by an airport in the summer of 1975, Jelmer Shjeflo saw an airport windsock with a ball on top of the pole supporting the windsock. The arrange-

ment reminded Shjeflo of a goose, and gave birth to his idea of a windsock hunting decoy. In 1976 Shjeflo developed a windsock decoy having a goose-head, stake, and windsock body bag.

Shjeflo applied for a utility patent on his conception on October 27, 1976. A single claim was presented for examination, which was allowed without rejection or amendment. The claim reads:

1. A decoy comprising a head portion having a neck portion therebeneath and made of relatively rigid material, a hoop member attached to the bottom of the neck portion and extending downward therefrom, a spike attached to the bottom of the hoop and projecting downward therefrom, said spike being adapted to be inserted into the ground, said head and neck portions simulating the head of a water fowl, a flexible bag having a wind sock construction with an opening at the front end with the edges of the bag adjacent the opening fixed to the hoop to keep and maintain the opening in an open condition, the bag having flared out center portions, a tapered rearward portion, whereby when the decoy is positioned so that the opening in the bag is facing into the wind, the wind will inflate the bag so that the bag will give the appearance of the body of a water fowl with the flared out center portions giving the appearance of the folded wings of the decoy, and the tapered rearward portion giving the appearance of the tail of the water fowl.

See also Figures 1 and 4 of the Shjeflo patent, No. 4,062,141, issued December 13, 1977, entitled "DECOY," reproduced below.

FIG.1.

FIG.4.

Shjeflo marketed his decoys under the name North Wind Decoys ("North Wind"), with little success in the first few years. In 1980, Shjeflo granted to the Jurgens a license to sell the decoys under the North Wind name. The Jurgens' sales grew slowly at first, but took off after they began selling the decoys as lawn ornaments. The Jurgens then purchased the Shjeflo patent and North Wind trademark for $187,500.

In 1985, CBK, Ltd. ("CBK") saw and obtained a North Wind decoy at a trade

show. Later, CBK's product designer traced around the Jurgens' windsock body and made some modifications to its shape. The resulting drawings were sent to Taiwan for production. CBK began selling its decoys, called "Wind Decoys," in 1986.

## B. Procedural History

On June 23, 1986, the Jurgens sued CBK and Timothy McKasy ("McKasy"), one of CBK's distributors, for selling windsock decoys. The Jurgens accused McKasy of infringing the Shjeflo patent,[1] and accused both McKasy and CBK of infringing its trade dress (the "look and feel" of its windsocks) under Lanham Act § 43(a), 15 U.S.C. § 1125(a) (1982),[2] and violating the Minnesota Deceptive Trade Practices Act ("MDTPA"), Minn.Stat. § 325D.44.

Shortly after the complaint was filed, CBK persuaded the Patent and Trademark Office ("PTO") to reexamine the Shjeflo patent claim in the light of prior art not considered in the original examination. Nonetheless, the patent claim was confirmed by the PTO without amendment.

Trial in the district court was by jury, with special verdicts. The jury returned special verdicts for the Jurgens on their claims for patent and trade dress infringement—finding $12,600 in patent damages (against McKasy) and $243,350 in § 43(a) damages ($1,350 against McKasy, $242,000 against CBK). For the MDTPA claim, the jury's verdicts were inconsistent. As to CBK, the jury found *no* MDTPA violation in one verdict, yet inexplicably assessed $800,000 in punitive damages in another. As to McKasy, it found no violation and assessed no damages.

For obvious reasons, the trial court delayed entering judgment upon the verdicts until the parties had submitted post-trial motions. The Jurgens moved for treble damages, prejudgment interest, and attorney fees on the patent and Lanham Act claims; and for JNOV/new trial on the

MDTPA "no liability" verdict. McKasy and CBK, on the other hand, moved for JNOV/new trial on the patent and Lanham Act claims, and CBK moved to strike the $800,000 punitive damage award under the MDTPA.

The court granted the Jurgens' motion for increased damages, doubling the patent and Lanham Act damages against McKasy and trebling the Lanham Act damages against CBK. The court also granted the Jurgens' motion for JNOV of liability against CBK on the MDTPA claim, thereby reconciling the inconsistency between the MDTPA verdicts. The court rejected the McKasy and CBK motion for JNOV on the patent and Lanham Act claims, because they had failed to move for a directed verdict at the close of all the evidence, and denied their alternative motion for a new trial. However, the court granted CBK's motion to strike the $800,000 punitive damage award as unwarranted by the evidence. The court deferred ruling on the Jurgens' request for prejudgment interest and attorney fees. Judgment was entered accordingly on July 5, 1989.

On August 3, 1989, McKasy and CBK appealed from the judgment (Appeal No. 89–1645), and on August 11, 1989, the Jurgens cross-appealed (Appeal No. 89–1658). Subsequently, on October 27, 1989, the district court ruled on the Jurgens' outstanding motion for prejudgment interest and attorney fees. After the court's ruling, McKasy and CBK appealed a second time (Appeal No. 90–1105), fearful that their first appeal may have been ineffective because of the Jurgens' outstanding motion for prejudgment interest. The Jurgens, however, filed no new notice of cross-appeal.

■ On May 22, 1990, upon motion by McKasy and CBK, we dismissed the Jurgens' cross-appeal No. 89–1658 (concerning the court's striking of the $800,000 punitive

---

1. According to the appellants, CBK was not sued for patent infringement because the venue requirements of 28 U.S.C. § 1400(b) (1982) were not satisfied with respect to CBK.

2. In this appeal we apply the language of § 43(a) that was operative before the 1988 amendment to that section. The 1988 amendments took effect on November 16, 1989, making them inapplicable to this case. *See* 15 U.S.C. § 1125 (1988).

damage award). We held that a notice of cross-appeal filed before the disposition of an outstanding motion for prejudgment interest was of "no effect." *Jurgens v. McKasy*, 905 F.2d 382, 385 (Fed.Cir.1990).

This opinion addresses the McKasy and CBK appeals, Nos. 89–1645 and 90–1105.[3]

## OPINION

### I. Standard of Review

■ In a jury trial, there are two decisionmakers, the judge and the jury. In general, the judge decides issues of law and issues committed to his discretion, and the jury decides issues of fact that are material to the case and in genuine dispute. On proper appeal from a judgment in a jury case, we review the decisions made by the judge for prejudicial legal error (*e.g.,* jury instructions) or abuse of discretion (*e.g.,* increasing damages), the standard depending upon the particular issue. In contrast, we review the sufficiency of the evidence underlying a jury verdict on an issue of fact to determine whether the jury's decision was supported by substantial evidence. *See, e.g., Wahpeton Canvas Co. v. Frontier, Inc.,* 870 F.2d 1546, 1552, 10 USPQ2d 1201, 1207 (Fed.Cir.1989).

■ Between these simple extremes of issues decided by the judge and issues decided by the jury are issues of law submitted to the jury upon disputed facts. When an issue of law has been submitted to the jury upon disputed facts—for example, a jury special verdict on patent claim obviousness where the underlying facts have been disputed—the standard of review has two parts. We first presume that the jury resolved the underlying factual disputes in favor of the verdict winner and leave those presumed findings undisturbed if they are supported by substantial evidence. *Perkin–Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 893, 221 USPQ 669, 674 (Fed.Cir.), *cert. denied,* 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984). Then we examine the legal conclusion *de novo* to see whether it is correct in light of the presumed jury fact findings. *See Newell Cos. v. Kenney Mfg. Co.,* 864 F.2d 757, 762, 9 USPQ2d 1417, 1421 (Fed.Cir.1988), *cert. denied,* —— U.S. ——, 110 S.Ct. 62, 107 L.Ed.2d 30 (1989); *Structural Rubber Prods. Co. v. Park Rubber Co.,* 749 F.2d 707, 718–19, 223 USPQ 1264, 1273 (Fed.Cir. 1984).

■ In this case, CBK and McKasy failed to bring a timely motion for directed verdict. That failure dramatically changes the standard of review on this appeal—at least with respect to fact issues decided by the jury. Where a directed verdict motion is not made at the close of the evidence, the sufficiency of the evidence underlying presumed jury findings cannot be challenged through a JNOV motion or on appeal. *Smith v. Ferrel,* 852 F.2d 1074, 1075 (8th Cir.1988); *Hubbard v. White,* 755 F.2d 692, 695–96 (8th Cir.), *cert. denied,* 474 U.S. 834, 106 S.Ct. 107, 88 L.Ed.2d 87 (1985). Accordingly, when CBK and McKasy failed to move for a directed verdict, they waived their right to challenge the presumed jury findings as unsupported by substantial evidence.

■ Nonetheless, CBK and McKasy may challenge the judgment below on the ground that the judge committed an error of law or abused his discretion. *Smith,* 852 F.2d at 1077; *Hubbard,* 755 F.2d at 694. Thus, despite their failure to move for a directed verdict, CBK and McKasy may challenge the judge's legal conclusion on obviousness, the judge's discretionary decision to award increased damages, the judge's jury instructions, and any other issue which was the province of the court rather than the jury and to which CBK and McKasy made a timely objection at trial.

### II. Patent Issues

#### A. Validity

■ McKasy challenges the judgment that the patent claim would not have been

---

**3.** We now dismiss McKasy and CBK appeal No. 89–1645 for the same reason we previously dismissed the Jurgens' cross-appeal. *See Jurgens,* 905 F.2d at 383 (dismissed as untimely). McKa-sy and CBK voice no objection to this dismissal because their appeal No. 90–1105, to which we devote this opinion, was timely and raises almost identical issues.

obvious under 35 U.S.C. § 103 (1988). Nonobviousness is a conclusion of law based upon the factual underpinnings stated in *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). *Revlon, Inc. v. Carson Prods. Co.*, 803 F.2d 676, 678, 231 USPQ 472, 473 (Fed.Cir.), *cert. denied*, 479 U.S. 1018, 107 S.Ct. 671, 93 L.Ed.2d 722 (1986). When the *Graham* factual underpinnings have been genuinely disputed, as in this case, we presume that the jury resolved them in favor of the verdict winner. *Perkin–Elmer*, 732 F.2d at 893, 221 USPQ at 674. In the absence of a proper motion for directed verdict during the trial below, the sole question for review is whether the factual story told to the jury by the verdict winner (we must assume that the jury correctly believed it) supports the legal conclusion of nonobviousness.

McKasy's challenge to the judgment of nonobviousness is based upon two prior art references: the "Dacian windsock" reference appearing in C. Hart, *Kites: An Historical Survey* (1967), and U.S. Patent No. 3,470,645 (the Mattson patent). Neither reference was expressly considered by a PTO examiner, either during examination or reexamination. Thus, McKasy seeks to take advantage of the doctrine that one *may* invalidate a patent more easily with prior art not considered by the examiner. *Kaufman Co. v. Lantech, Inc.*, 807 F.2d 970, 973, 1 USPQ2d 1202, 1204 (Fed.Cir. 1986).

McKasy's first argument, in a nutshell, is that the Dacian windsock is the "missing link" in the prior art—the reference which the examiner sought but could not find during reexamination. In support of this argument, McKasy quotes from the reexamination examiner's *Reasons For Allowance and/or Confirmation:*

> The prior art [present in this reexamination] can be broken down into three broad categories. The first are floating decoys. . . .
>
> The second category consists of land-type decoys
>
> . . . .

The third category of prior art consists of windsock devices. . . .

As for obviousness, there is no teaching, suggestion, or inference in any of the references or any knowledge generally available to one of ordinary skill in the art to combine the teachings of the references to achieve the claimed invention. *Specifically, there is no teaching to combine any of the . . . windsock arrangements with any of the other references of record [i.e., decoys].* [Citation omitted. Emphasis added.]

The Dacian windsock, McKasy asserts, supplies the missing link between windsocks and decoys because it is a windsock that has the appearance of an animal. McKasy quotes from Hart:

> The Dacian windsock . . . consisted of a hollow dragon's head mounted on a pole, behind which the fabric tube was fixed. . . . When in use, it was held up into the wind, or above the head of a horseman, which allowed it to fill out with air and give the appearance of being alive.

C. Hart, *Kites: An Historical Survey* (1967) at 63.

In response, the Jurgens assert that the Dacian windsock is not prior art "analogous" to windsock decoys because the Dacian windsock was a horseman's battle implement, designed to terrorize enemies, not entice fowl. See generally *In re Wood*, 599 F.2d 1032, 1036, 202 USPQ 171, 174 (CCPA 1979), for what is "analogous" art. See also *Kimberly–Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1449–54, 223 USPQ 603, 610–14 (Fed.Cir.1984).

We need not say which of these arguments is more persuasive. Whether the Dacian windsock is "analogous" art was a question of fact for the jury and we presume the jury decided the Dacian windsock was not analogous art. See *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1568 n. 9, 1 USPQ2d 1593, 1597 n. 9 (Fed. Cir.) ("Whether something legally within the prior art is 'analogous' is a fact question"), *cert. denied*, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987). McKasy cannot challenge that presumed finding be-

cause he failed to move for a directed verdict. And if we presume that the Dacian windsock is not analogous art, it has no bearing on the obviousness of the patent claim.

McKasy's second argument is that the Mattson patent is the missing link between windsocks and decoys. (See Figures 1 and 2 below, which appear in the Mattson patent specification.) Mattson, all agree, is the most pertinent prior art. It discloses a bird decoy having a collapsible frame 11 and a weighted fabric cover 21. The frame is the bird's skeleton and the cover is the bird's feathered skin. There is an opening 23 in the lower front of the cover. Attached to the edges of this opening are weights 24 which hold the cover onto the frame by gravity.

FIG 1

FIG 2

In support of his argument that the Mattson patent is a windsock-type decoy, McKasy relies on the bag-like structure of Mattson's cover 21, and language in the patent specification that "[a]ny wind or air movement through the longitudinal opening [23] will produce a riffling effect of the flexible cover so that body movement of the fowl will be simulated."

In response, the Jurgens contend that the Mattson patent does not show a *windsock*, so it cannot "link" windsocks and

decoys. The Jurgens contend that Mattson is not a *windsock* decoy since its cover assumes the shape of a fowl by means of "transverse frame elements" 14, not by *wind.* A windsock, the Jurgens argue, is inflated by wind; it needs no internal frame. As to the language in the specification cited by McKasy, the Jurgens argue that the mere fact of "riffling" does not make Mattson's cover a windsock.

■ Once again, we need not say which of these arguments is more persuasive. What a reference teaches is a question of fact for the jury to decide, and we presume they resolved it in the Jurgens' favor. *Panduit,* 810 F.2d at 1579 n. 42, 1 USPQ2d at 1606 n. 42 (what a reference teaches is a question of fact). McKasy cannot challenge that presumed finding because he failed to move for a directed verdict. And if we assume, as we must in this appeal, that the Mattson patent does not disclose a windsock, but merely a stationary bird-decoy, then that decoy would be no different than the stationary decoys considered twice by the PTO in determining obviousness. On the record before us, it would not have rendered obvious the Shjeflo claim.

### B. Infringement

■ Infringement may be found only if "every limitation set forth in a claim [is] found in an accused product or process exactly or by a substantial equivalent." *Johnston v. IVAC Corp.,* 885 F.2d 1574, 1577, 12 USPQ2d 1382, 1384 (Fed.Cir.1989) (citations omitted). Where all claim limitations are present in the accused device exactly, the claims "read on" the accused device and literal infringement is made out. Even where there is no literal infringement, infringement *may* still be found under the doctrine of equivalents if the limitation or limitations not literally present are there by equivalents. *Becton Dickinson & Co. v. C.R. Bard, Inc.,* 922 F.2d 792, 795–96 (Fed.Cir.1990).

■ An analysis of infringement involves two steps. First, a claim is construed without regard to the accused product. *See Moeller v. Ionetics, Inc.,* 794 F.2d 653, 656–57, 229 USPQ 992, 994–95 (Fed. Cir.1986). Second, the claim is compared with the accused product, to determine whether all of the limitations of the claim are present either exactly or by a substantial equivalent. *See id.; Lemelson v. United States,* 752 F.2d 1538, 1551, 224 USPQ 526, 533 (Fed.Cir.1985).

Here, McKasy challenges the verdict of infringement, assuming that the jury found both literal infringement and infringement by equivalents.

### 1. Literal Infringement

■ McKasy's challenge to the presumed verdict of literal infringement focuses on the following claim limitations (*see* Figures 1 and 4, above):

[A] hoop member attached to the bottom of the neck portion and extending downward therefrom, a spike attached to the bottom of the hoop and projecting downward therefrom....

McKasy asserts that the word "attached" in these limitations means directly connected or touching. The Jurgens counter that "the claim only requires that the hoop member support the neck portion, and the spike support the hoop member." The parties agree that resolution of this dispute—a question of law which we review *de novo, see Howes v. Medical Components, Inc.,* 814 F.2d 638, 643, 2 USPQ2d 1271, 1273–74 (Fed.Cir.1987)—resolves the question of literal infringement. They are not in disagreement as to whether the claim literally covers the product, once properly construed. If the Jurgens' interpretation prevails there is literal infringement; if McKasy's interpretation prevails there is no literal infringement.[4]

---

**4.** Jurgens and McKasy agree that the accused windsocks have no series connection from neck to hoop to spike. The hoop in an accused windsock (as in the patent) is sewn into the windsock body at the opening of the windsock. The hoop in an accused windsock, though, touches neither the decoy's neck nor the spike. The spike punctures the windsock fabric immediately behind the hoop, leaving the hoop supported by the fabric to which it is secured, in front of the spike. Thus, the spike is inserted directly into the neck (after puncturing the

We hold that the quoted claim limitations literally require a direct series connection between neck, hoop, and spike. That is the meaning which the reexamination examiner ascribed to the limitation, without dispute by Shjeflo's attorney, when he stated:

There simply is no teaching of a head, neck, hoop and stake connected in series....

*Reasons for Allowance and/or Confirmation* at 4. Moreover, neither the specification nor the prosecution history indicates that Shjeflo intended another meaning.

As a matter of law, there is no literal infringement.

### 2. Infringement by Equivalents

McKasy challenges the judgment of infringement by equivalents on two grounds. First, he asserts that the jury could not have found from the evidence that the accused windsocks contain every limitation of the claim—either exactly *or* equivalently. *See Johnston*, 885 F.2d at 1577, 12 USPQ2d at 1384 (infringement may be found only if the accused product contains every limitation either exactly or by a substantial equivalent). Second, he asserts that even if the jury could have found the exact or substantial presence of every limitation in the accused windsocks, the judgment would be erroneous as a matter of law because the patent would then encompass the prior art described above. *See Wilson Sporting Goods Co. v. David Geoffrey & Assoc.*, 904 F.2d 677, 683, 14 USPQ2d 1942, 1947–48 (Fed.Cir.) (prior art may prevent infringement by equivalents even if every limitation of an asserted claim is exactly or substantially present in an accused product), *cert. denied*, —— U.S. ——, 111 S.Ct. 537, 112 L.Ed.2d 547 (1990).

 McKasy's first argument submits to a simple answer given the procedural posture of this appeal: whether the McKasy windsocks contain structure that is "equivalent" to every claim limitation was a disputed question of fact at trial. *See Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 936, 4 USPQ2d 1737,

1740–41 (Fed.Cir.1987) (equivalency of claim limitations and accused structure is a question of fact), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988). It was presumably resolved by the jury against McKasy and he may not challenge that finding on this appeal.

 McKasy's second argument for noninfringement presents a question of law, which may have factual underpinnings. *See Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 870, 228 USPQ 90, 96 (Fed.Cir.1985); *Wilson*, 904 F.2d at 683–84, 14 USPQ2d at 1948. In this situation, as for obviousness, we presume that the jury resolved the underlying factual disputes in favor of the Jurgens and (because McKasy failed to move for a directed verdict) inquire only whether the legal conclusion embodied in the judgment—that the patent did not encompass the prior art—is correct in light of the presumed jury findings.

 We have recently noted that it may be helpful to "conceptualize" the prior art limitation on the doctrine of equivalents by envisioning a hypothetical patent claim—similar to the asserted claim but broad enough to literally cover the accused products—and testing whether that claim would have been patentable in view of the prior art. *Id.* at 684–85, 14 USPQ2d at 1948–49. Using that approach in this case, to cover McKasy's windsocks literally the hypothetical claim would be identical to the original claim, except that it would relax the limitation that requires a direct series connection between neck, hoop, and spike. The hypothetical claim would permit that connection to be made indirectly, through the windsock fabric. *See* note 4, *supra.*

McKasy strenuously argues that the Mattson patent (*see* Figure 1 above) shows precisely this indirect connection between neck, hoop, and spike. But as we have explained earlier, the jury presumably found that Mattson *does not disclose a windsock*, an underlying finding which McKasy cannot challenge here. If we assume that Mattson does not disclose a windsock, then the hypothetical claim,

windsock fabric twice) without touching the hoop.

viewed as a whole, would not have been obvious in view of Mattson for reasons we have stated earlier. As for the Dacian windsock, McKasy's other new found reference, the jury presumably found that that reference was not analogous art.

As discussed above with respect to validity, the PTO examiner found, and we agree, that there was no linkage between "decoy" prior art (such as Mattson) and windsock prior art (such as the Dacian windsock). That reasoning holds true for patentability of the hypothetical claim. Thus, the prior art does not bar infringement by equivalents.

### C. Increased Damages

■ If patent infringement is willful, as the jury found here, increased damages may be awarded at the discretion of the trial judge. 35 U.S.C. § 284 (1988); *Ryco, Inc. v. Ag–Bag Corp.*, 857 F.2d 1418, 1429, 8 USPQ2d 1323, 1332 (Fed.Cir.1988). In deciding whether to increase damages, the court must consider all of the circumstances of the case. *See Kloster Speedsteel AB v. Crucible Inc.*, 793 F.2d 1565, 1579, 230 USPQ 81, 90–91 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1034, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987).

McKasy argues that the judge abused his discretion in doubling the patent damages, because McKasy had no knowledge of the patent when he began selling his windsocks and, upon learning of the Jurgens' threat of infringement, he removed the windsocks from his shelves. According to McKasy, he resumed sales only when he was assured by CBK (through CBK's patent attorney) that there was no infringement. In addition, he asserts he made a substantial challenge to the charge of patent infringement.

■ The Jurgens assert that McKasy's argument is unpersuasive because McKasy had a duty to obtain legal advice *before*, not *after*, he began selling CBK's products, citing *Underwater Devices, Inc. v. Morrison–Knudsen Co.*, 717 F.2d 1380, 219 USPQ 569 (Fed.Cir.1983). We disagree.

Although the court in *Underwater Devices* stated that infringers have a "duty to seek and obtain competent legal advice from counsel *before* the initiation of any possible infringing activity," *id.* at 1390, 219 USPQ at 576, the infringer in that case knew of the patent before it began infringing. In that context advice of counsel *before* selling the product may be appropriate, and at least is possible.[5] In contrast, here McKasy had no knowledge of the patent when he began selling windsocks.

■ The Jurgens' attack on the quality of the legal advice ultimately relied upon by McKasy is more persuasive. The "opinion of counsel" that McKasy wore as a shield after he was threatened with infringement was merely a letter of assurance from CBK, informing McKasy that CBK had obtained an opinion of counsel that the patent was invalid and not infringed. No copy of the opinion accompanied CBK's assurance letter, and McKasy did not investigate further. Moreover, the record shows that although McKasy did temporarily stop selling windsocks, he started selling again after receiving an indemnity agreement from CBK—still without advice of counsel. Finally, McKasy employed a "shotgun" approach to the defense of this patent suit, asserting and pursuing every conceivable defense, only to concede many of them during oral argument in the trial court.

Under these circumstances, the judge did not abuse his discretion in doubling the patent damages award against McKasy.

### III. Lanham Act Issues
#### A. Liability

■ Under Eighth Circuit law, a combination of design features—a "trade dress" —is entitled to protection under § 43 of the Lanham Act if that combination is nonfunctional, has acquired secondary meaning, and if a product using those features is likely to cause confusion, mistake, or deception. *Truck Equip. Serv. Co. v. Fruehauf Corp.*, 536 F.2d 1210, 1217, 191 USPQ

---

5. We have since held that failure to obtain advice of counsel does not mandate a finding of willful infringement or increased damages. *Kloster*, 793 F.2d at 1579, 230 USPQ at 90.

79, 85 (8th Cir.), *cert. denied,* 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976).[6] Here, McKasy and CBK challenge the judgment of trade dress infringement on several grounds.

McKasy and CBK first argue that the court erred by refusing to instruct the jury that it could not find the Jurgens' asserted trade dress to be "nonfunctional" if doing so would hinder competition. We disagree. While that is a correct statement of Eighth Circuit law, *see Prufrock, Ltd. v. Lasater,* 781 F.2d 129, 133, 228 USPQ 435, 438 (8th Cir.1986), and it would have been preferable for the court to include the instruction, we are not convinced that the omission was prejudicial. The instructions given by the court stated the basic factors to be considered by the jury in determining functionality. An *additional* instruction on whether competition would be hindered was not essential in view of the instructions which were given.

McKasy and CBK also assert prejudicial legal error in the judge's instruction that "You are permitted to decide whether there is a likelihood of confusion based solely upon inspection of the CBK and Jurgens wind-inflated decoys and their manner of use." McKasy contends the instruction was erroneous because it failed to list several *other* factors that should be considered under Eighth Circuit law. *See SquirtCo v. Seven–Up Co.,* 628 F.2d 1086, 1090–91, 207 USPQ 897, 900 (8th Cir.1980) (listing the "SquirtCo factors"). While McKasy and CBK correctly state the law, they fail to recognize that jury instructions must be considered *as a whole* in determining whether the jury was properly instructed. *See, e.g., Railroad Dynamics, Inc. v. A. Stucki Co.,* 727 F.2d 1506, 1518, 220 USPQ 929, 940 (Fed.Cir.), *cert. denied,* 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984). Here, the jury instructions as a whole correctly stated Eighth Circuit law because elsewhere the judge stated that "[l]ikelihood of confusion is also deter-

mined by evaluating the following [*Squirt-Co*] factors...." McKasy and CBK also challenge the instruction because it failed to tell the jury that likelihood of confusion must result from the use of *nonfunctional* features. We reject this argument on the same reasoning: elsewhere the jury was instructed multiple times that it must find the asserted trade dress to be nonfunctional before it could find infringement.

*B. Increased Damages*

Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a) (1988), which sets forth monetary remedies, states in pertinent part:

When a ... violation under section 43(a), shall have been established ... the plaintiff shall be entitled, ... subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. *Such sum in either of the above circumstances shall constitute compensation and not a penalty.* The court in exceptional cases may award reasonable attorney fees to the prevailing party. [Emphasis ours.]

In *Metric & Multistandard Components Corp. v. Metric's, Inc.,* 635 F.2d 710, 209 USPQ 97 (8th Cir.1980), the Eighth

---

**6.** "When dealing with issues of unfair competition law, over which this court does not have exclusive appellate jurisdiction, we look to the law of the regional circuit where the district

court sits," here the Eighth Circuit. *Cicena, Ltd. v. Columbia Telecommunications Group,* 900 F.2d 1546, 1548, 14 USPQ2d 1401, 1403 (Fed.Cir. 1990).

Circuit held that this section gives a district court broad discretion to adjust monetary relief to serve the interests of justice, including trebling the jury verdict, "provided it does not award such relief as a penalty." *Id.* at 715, 209 USPQ at 102. McKasy and CBK contend that in this case the district court abused its discretion in increasing the jury damage award because it did so, *not* to compensate for difficulty in measuring or proving damages, but to penalize them for opprobrious conduct. In response, the Jurgens contend that courts have allowed trebling of damages to punish willful infringement. In addition, the Jurgens contend that the court's award in this case was compensatory, not punitive.

We agree with the Jurgens that at least one court has allowed the trebling of damages to penalize willful infringers. *See Gorenstein Enterprises, Inc. v. Quality Care–USA, Inc.*, 874 F.2d 431, 435–36 (7th Cir.1989). But on issues of unfair competition, our precedent requires us to defer to the views of the regional circuit in which the district court sits. *Cicena*, 900 F.2d at 1548, 14 USPQ2d at 1403. Here, Eighth Circuit law controls and *Metric* makes clear that the district judge may increase damages, "providing it does not award such relief as a penalty." 635 F.2d at 715, 209 USPQ at 102.

The Jurgens' argument that the judge increased damages with "compensation" in mind is disingenuous. The Jurgens' attorney urged the court to increase the award for one reason:

> The purpose of the trebling provisions is to punish the defendants and deter similar conduct. And this is clearly such a situation where trebling would be appropriate. It ... recognizes the fact that the jury in this case clearly believed that the defendants ... had engaged in conduct with willful indifference to the rights of the Jurgens....

The court's reliance on this punitive purpose is equally clear. When it ruled on the Jurgens' motion for increased damages, the court remarked:

> As to the Lanham Act damages ... the court holds that plaintiffs are entitled to

an award of treble damages against defendant CBK. The jury found that CBK willfully violated the Lanham Act. There was sufficient evidence that CBK knowingly copied plaintiffs' product and attempted to assert the good will plaintiffs had established in the decoy market. The court believes the jury's attempted award of $800,000 in punitive damages shows that the jury reached the conclusion as well. CBK's obvious attempt to mimic the appearance of plaintiffs' product warrants treble damages.

Additionally, in denying the Jurgens' motion to reinstate the previously-struck $800,000 punitive damages award under the MDTPA, the court stated:

> [T]he court states for the record that it believes that its trebling of the Lanham Act damage award against CBK fully satisfies any punitive or deterrent purpose that would be accomplished by a punitive damage award [under the MDTPA.]

In summary, it is clear that the district court increased the jury damage award "as a penalty" against McKasy and CBK. Under *Metric* this is an impermissible reason for increasing Lanham Act damages. Since the Jurgens advanced no other reason at trial why the district court should have increased damages, the district court abused its discretion in increasing Lanham Act damages.

## IV. Other Arguments

We have considered McKasy's and CBK's numerous other arguments, including their argument that the judge abused its discretion in denying their motion for a new trial, but find them unpersuasive.

## CONCLUSION

We *reverse* the judgment in Appeal No. 90–1105 insofar as it increased Lanham Act damages. In all other respects, we *affirm*. We *dismiss* Appeal No. 89–1645 for lack of appellate jurisdiction.

## COSTS

No costs.

89–1645 DISMISSED.

90–1105 AFFIRMED–IN–PART
REVERSED–IN–PART.